# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MONTEFIORE MEDICAL CENTER,

        *Plaintiff*,

      v.

ROBERT F. KENNEDY, JR.,

        *Defendant*.

Civil Action No. 24 - 1810 (LLA)

## MEMORANDUM OPINION

For two decades, hospitals that serve larger numbers of low-income patients have challenged federal policies directed at the payments they receive for providing care. This case concerns a 2023 rule from the U.S. Department of Health and Human Services ("HHS") that interpreted a provision in the Medicare statute about how these payments should be calculated for outstanding reimbursement requests for years before 2014.

Plaintiff Montefiore Medical Center brings this action against Robert F. Kennedy, Jr. in his official capacity as Secretary of Health and Human Services,[1] alleging that HHS's rule is impermissibly retroactive and procedurally invalid under the Medicare statute, 42 U.S.C. § 1395 *et seq.*, and arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* ECF No. 1. Montefiore asks the court to declare the 2023 Rule unlawful and set it aside. *Id.* ¶ 101. Both parties have moved for summary judgment. ECF Nos. 19, 21. For the

---

[1] Montefiore named former Secretary of Health and Human Services Xavier Becerra as Defendant, but the current Secretary is "automatically substituted" as a party pursuant to Federal Rule of Civil Procedure 25(d).

reasons discussed below, the court will grant Montefiore's motion for summary judgment and deny the Secretary's cross-motion for summary judgment.

## I.     BACKGROUND

### A.     Medicare's Disproportionate Hospital Share Adjustment

"The Medicare program provides Government-funded health insurance to over 64 million elderly or disabled Americans." *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 428 (2022).  Congress divided Medicare into five "parts."  *See generally* Social Security Amendments Act of 1965, Pub. L. No. 89-97, § 102, 79 Stat. 286, 291-332 (codified as amended at 42 U.S.C. § 1395 *et seq.*).  Two are relevant here.  Under Part A, HHS pays hospitals directly for services they provide to qualifying beneficiaries.  42 U.S.C. §§ 1395c to 1395i-6.  Under Part C, an individual who is entitled to benefits under Part A may enroll in a privately administered Medicare Advantage program in lieu of using Part A benefits.  *Empire Health*, 597 U.S. at 429; *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011); *see* 42 U.S.C. § 1395w-21(a)(1).[2]

HHS's direct payments to hospitals for services rendered to Part A beneficiaries are based on a "fixed rate" for a given treatment—which is set to "reflect the amounts an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis"—and then HHS adds "various hospital-specific rate adjustments." *Empire Health*, 597 U.S. at 429.  At issue here is the "disproportionate share hospital" ("DSH") adjustment, which provides "enhanced

---

[2] Although now called "Medicare Advantage," the previous name for the Part C program was "M+C" or "Medicare+Choice." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1106 n.2 (D.C. Cir. 2014).  While the Medicare statute uses both interchangeably, the court refers to the Part C program as Medicare Advantage unless the Medicare+Choice designation is relevant for historical purposes.

Medicare payments" to "hospitals serving an 'unusually high percentage of low-income patients.'" *Id.* (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013)).  Because "low-income individuals are often more expensive to treat than higher[-]income ones, even for the same medical conditions," the DSH adjustment "encourages hospitals" to serve those patients.  *Id.*

To calculate an adjustment based on the low-income patients a hospital has served, HHS adds together two fractions: one, the Medicare fraction, captures the "proportion of a hospital's Medicare patients who have low incomes," and another, the Medicaid fraction, captures the "proportion of a hospital's patients who are not entitled to Medicare and have low incomes."  *Id.* at 429-30.  As a proxy for "low income" in the Medicare fraction, the statute uses entitlement to "supplemental security income" ("SSI") benefits.  *Id.*; *see* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  SSI benefits are available to low-income individuals "who are aged, blind, or disabled regardless of their insured status."  *Smith v. Berryhill*, 587 U.S. 471, 475 (2019) (quoting *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)).  As a proxy for "low income" in the Medicaid fraction, the statute uses entitlement to the Medicaid program, which "provides health insurance to all low-income individuals, regardless of age or disability."  *Empire Health*, 597 U.S. at 430; *see* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

This case concerns the Secretary's interpretation of the statutory definitions of the two fractions.  The numerator in the Medicare fraction "is the number of [a] hospital's patient days for [a fiscal year] which were made up of patients who (for such days) were *entitled to benefits under* [*P*]*art A of* [*Medicare*] and were entitled to [SSI] benefits."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added).  The "denominator . . . is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under* [*Medicare*] [*P*]*art A*."  *Id.* (emphasis added).

The Medicaid fraction operates somewhat differently, as it must to avoid double counting certain individuals.  Because Medicaid does not consider a person's age or disability, a low-income elderly or disabled American might qualify for both Medicare and Medicaid.  Rather than calculate the patient days attributable to all Medicaid patients, the Medicaid fraction strips out those associated with "dually eligible" patients.  Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, 88 Fed. Reg. 37772, 37774 (June 9, 2023) (to be codified at 42 C.F.R. pt. 412) ("2023 Rule").  The numerator in the Medicaid fraction thus includes "the number of the hospital's patient days for [a fiscal year] which consist of patients who (for such days) were eligible for medical assistance under [Medicaid], *but who were not entitled to benefits under* [*P*]*art A of* [*Medicare*]."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  And the denominator is "the total number of the hospital's patient days for such [fiscal year]."  *Id.*

The Centers for Medicare and Medicaid Services ("CMS") is the HHS component responsible for administering the Medicare program.  *Id.* § 1395kk; *Saint Francis Ctr. v. Azar*, 894 F.3d 290, 291-92 (D.C. Cir. 2018).  CMS contracts with a "fiscal intermediary"—known as a Medical Administrative Contractor ("MAC")—that initially calculates the sum of the two fractions.  42 C.F.R. §§ 412.106(b)(4), 421.400 (2024).  That sum—the "disproportionate patient percentage," 42 U.S.C. § 1395ww(d)(5)(F)(v)-(vi)—determines whether a hospital receives a DSH adjustment.  How much money a hospital receives depends on where it is located, its size, and the value of the combined percentages.  *Id.* § 1395ww(d)(5)(F)(v).  Larger hospitals have lower thresholds to qualify for an adjustment, but for all providers, higher disproportionate patient percentages result in larger reimbursements from HHS.  *Id.* § 1395ww(d)(5)(F)(v), (vii).

Upon calculating the combined fraction, the MAC issues a "notice of program reimbursement" ("NPR") that contains a "[p]rospective payment" detailing the "total amount of the payments due the hospital . . . for the cost reporting period covered by the notice." 42 C.F.R. § 405.1803. Providers seeking to contest their NPR must first do so before HHS's Provider Reimbursement Review Board ("PRRB"), which may affirm, modify, or reverse the MAC's cost report. 42 U.S.C. § 1395oo(d). The Secretary may, "on his own motion," alter the PRRB's decision. *Id.* § 1395oo(f)(1). A hospital can seek judicial review within sixty days of the PRRB's "final decision," although the statute also permits review if the PRRB determines that it lacks authority to resolve a "question of law or regulations relevant to the matters in controversy." *Id.*

### B.    The Medicare Statute's Limitations on Retroactive Rulemaking

The parties maintain that several provisions in the Medicare statute bear on the Secretary's authority to issue rules with retroactive effect. Generally, the Secretary is required to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] program[]." *Id.* § 1395hh(a)(1). But Congress has circumscribed that authority in several ways.

First, the Secretary may "establish[] or change[] a substantive legal standard governing," among other things, "the payment for services," only by promulgating a regulation to that effect. *Id.* § 1395hh(a)(2). If any regulation "includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation." *Id.* § 1395hh(a)(4).

Next, the Medicare statute expressly addresses retroactivity. Any "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability . . . shall not be applied (by extrapolation or otherwise) retroactively to items and

services furnished before the effective date of the change," *id.* § 1395hh(e)(1)(A), unless the change meets one of two criteria: the Secretary may "determine[]" that "such retroactive application is necessary to comply with statutory requirements," *id.* § 1395hh(e)(1)(A)(i); or that "failure to apply the change retroactively would be contrary to the public interest," *id.* § 1395hh(e)(1)(A)(ii).

Finally, the Medicare statute prohibits any "action . . . taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change." *Id.* § 1395hh(e)(1)(C).

### C.    Rulemaking Concerning, and Litigation Over, the DSH Adjustment

"Before 2004, HHS had *not* treated Part C enrollees as 'entitled to benefits under Part A.'" *Allina Health Servs. v. Price*, 863 F.3d 937, 939 (D.C. Cir. 2017) (quoting *Ne. Hosp. Corp.*, 657 F.3d at 15), *aff'd sub nom.*, *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ("*Allina II*"). While HHS's regulation addressing DSH adjustments "did not specify where [Medicare Advantage] enrollees should be counted," the Secretary had a "practice" of "excluding [Part C] days from the Medicare fraction." *Ne. Hosp. Corp.*, 657 F.3d at 14, 17.

"In 2003, the agency proposed codifying that practice in a formal rule." *Allina Health Sys. v. Becerra*, No. 23-CV-2144, 2024 WL 4332061, at *3 (D.D.C. Sep. 27, 2024) ("*Allina IV*"); *see* Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 27208 (May 19, 2003). "After the notice-and-comment period, HHS reversed course and issued a final rule . . . announcing that it would treat Part C enrollees as 'entitled to benefits under Part A.'" *Allina IV*, 2024 WL 4332061, at *3 (quoting Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal

Year 2005 Rates, 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004) ("2004 Rule")).  The 2004 Rule was intended to become effective on October 1, 2004.  2004 Rule, 69 Fed. Reg. at 49099.

**1.**     ***Northeast Hospital Corp. v. Sebelius*: Challenge to Retroactive Application of the 2004 Rule**

Through one of HHS's MACs, Beverly Hospital received DSH calculations for Fiscal Years 1999 through 2002 that, based on the application of the 2004 Rule, included Part C patients in the Medicare fraction on the theory that they remained entitled to Part A benefits.  *See Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81, 85, 92 (D.D.C. 2010).   Its owner, Northeast Hospital Corporation, appealed to the PRRB, "arguing that [Part C beneficiaries] eligible for Medicaid should be counted in the numerator of the Medicaid fraction because they are not 'entitled to benefits' under Part A."  *Ne. Hosp. Corp.*, 657 F.3d at 4.  After the PRRB agreed with the MAC and the Secretary affirmed, concluding that Part C patients remain entitled to Part A benefits, Northeast Hospital Corporation sought judicial review.  *Id.*  The district court granted summary judgment to Northeast Hospital Corporation because it determined that Part C patients "eligible for Medicaid must be counted in the Medicaid fraction because [they] are no longer 'entitled to benefits under Part A' once they elect Part C."  *Id.* (quoting *Ne. Hosp. Corp.*, 699 F. Supp. 2d at 93).  The Secretary appealed.  *Id.*

In resolving the case, the D.C. Circuit reviewed the Secretary's 2004 interpretation of the DSH provision under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  At *Chevron* step one, the Circuit held that the Medicare statute did not "unambiguously foreclose[] the Secretary's interpretation," *Ne. Hosp. Corp.*, 657 F.3d at 5; instead, Congress had "left a statutory gap" for the Secretary to fill, *id.* at 13.  The Circuit then sidestepped *Chevron* step two.  Rather

than decide whether the Secretary's interpretation was "reasonable," the Circuit concluded that the Secretary could not apply it retroactively because doing so would "contradict[] her former practice." *Id.* at 13, 16-17. In so holding, the Circuit curiously did not consider whether the Secretary's retroactive application was consistent with the Medicare statute's provision allowing for retroactive substantive changes to "regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability" in certain circumstances. 42 U.S.C. § 1395hh(e)(1)(A); *see Ne. Hosp. Corp.*, 657 F.3d at 17 ("We are aware of no statute that authorizes the Secretary to promulgate retroactive rules for DSH calculations.").

### 2.    *Allina I*: Challenge to Prospective Application of the 2004 Rule

In 2010, various hospitals challenged the validity of the 2004 Rule and claimed that it had resulted in improperly low DSH adjustments for Fiscal Year 2007. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105, 1107 (D.C. Cir. 2014) ("*Allina I*"). The district court vacated the rule, and the D.C. Circuit affirmed, concluding that the 2004 Rule was not a "logical outgrowth" of the proposed rule—which had contemplated *excluding* patient days associated with Part C beneficiaries from the Medicare fraction and including them in the numerator of the Medicaid fraction—and thus violated the Medicare statute's notice-and-comment requirements. *Id.* at 1109-10.

### 3.    *Allina II*: Challenge to FY 2012 Medicare Fraction

In 2013, in response to *Allina I*, HHS issued a new rule prospectively adopting the policy of treating Part C enrollees as "entitled to benefits under Part A." *See* Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Payment System and Fiscal Year 2014 Rates, 78 Fed. Reg. 50496, 50614 (Aug. 19, 2013)

8

("2013 Rule").[3]  In 2014, CMS posted the Medicare fractions for Fiscal Year 2012 on its website and noted that the calculations included Part C patients.  *Allina II*, 587 U.S. at 571.  Some of the *Allina I* plaintiffs challenged the practice because the 2004 Rule had been vacated and the 2013 Rule was intended to only be prospective.  *See id.* at 571-72.  Ultimately, the Supreme Court held that the published fractions amounted to a "statement of policy" that was subject to the Medicare statute's notice-and-comment requirements and that HHS had not identified a lawful excuse for neglecting its notice-and-comment obligations.  *Id.* at 572-73, 583-84.  Consequently, HHS could not rely on the published fractions.

### 4.    *Allina III*: Challenge to 2015 Agency Adjudication

In late 2014, while *Allina II* was pending, HHS notified hospitals that the CMS Administrator would issue an interpretation of the statutory phrase "entitled to benefits under Part A" as it related to the DSH adjustment used to calculate payments for Fiscal Year 2007.  *See* Pls.' Opp'n to Def.'s Mot. to Dismiss, Ex. B, *Allina Health Sys. v. Burwell*, No. 16-CV-150 (D.D.C. May 4, 2016) ("*Allina III*"), ECF No. 12-2.  After receiving comments, HHS issued a final administrative decision concluding that Part C enrollees must be included in the Medicare fraction.

---

[3] In 2021, a court in this district upheld the 2013 Rule under the APA.  *Fla. Health Scis. Ctr., Inc. v. Becerra*, No. 19-CV-3487, 2021 WL 2823104 (D.D.C. July 7, 2021), *appeal filed*, No. 21-5192 (D.C. Cir.  Sep. 9,  2021);  Am.  Compl.,  *Fla.  Health  Scis.  Ctr.,  Inc.*,  No. 19-CV-3487 (D.D.C. Dec. 7, 2020), ECF No. 52 (Plaintiffs' amended complaint removing Florida Health Sciences  Center  as  a  plaintiff,  leaving  Allina  Health  System  as  named  Plaintiff).    From December 2021 through June 2025, the appeal was held in abeyance, first pending the Supreme Court's decision in *Empire Health*, 597 U.S. 424, and then pending the Supreme Court's decision in *Advocate Christ Medical Center v. Kennedy*, 605 U.S. 1 (2025).  Order, *Allina Health Sys. v. Becerra*, No. 21-5192 (D.C. Cir. Dec. 8, 2021); Order, *Allina*, No. 21-5192 (D.C. Cir. Jan. 6, 2023); Order, *Allina*, No. 21-5192 (D.C. Cir. Aug. 2, 2024).  In July 2025, the D.C. Circuit issued an order continuing to hold the appeal in abeyance pending this court's disposition of the cross-motions for summary judgment here.  Order, *Allina Health Sys. v. Kennedy*, No. 21-5192 (D.C. Cir. July 28, 2025).

*Allina Health Servs., Inc. v. Burwell*, No. 2010-D38-R, at 24-45 (Ctrs. for Medicare & Medicaid Servs. Dec. 1, 2015).[4]  The *Allina I* plaintiffs then filed *Allina III* to challenge HHS's decision to adopt this interpretation through agency adjudication rather than rulemaking.  Compl. ¶¶ 1, 38, *Allina III*, No. 16-CV-150 (D.D.C. Jan. 29, 2016), ECF No. 1.  After the district court denied HHS's motion to dismiss, the parties agreed to stay the case until *Allina II* was resolved.  Mem. Op., *Allina III*, No. 16-CV-150 (D.D.C. Aug. 4, 2017), ECF No. 16; Aug. 17, 2017 Minute Order, *Allina III*, No. 16-CV-150.  Following the Supreme Court's decision in *Allina II*, the district court remanded *Allina III* to HHS.  Order, *Allina III*, No. 16-CV-150 (D.D.C. Oct. 25, 2019), ECF No. 34.

### 5.    *Allina IV*: Premature Challenge to the 2023 Rule

After the remand in *Allina III*, HHS issued a notice of proposed rulemaking that would treat Part C enrollees as "entitled to benefits under [P]art A" in the Medicare fraction for the years before Fiscal Year 2014.  *See* Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, 85 Fed. Reg. 47723, 47725 (Aug. 6, 2020) (to be codified at 42 C.F.R. pt. 412) ("2023 Proposed Rule").  After the notice-and-comment period, HHS published the final rule in June 2023, with an effective date of August 8, 2023, adopting the proposed rule's interpretation that Part C beneficiaries are "entitled to benefits under Part A" for pre-2014 DSH adjustments.  2023 Rule, 88 Fed. Reg. at 37773.

In July 2023—the month before the 2023 Rule went into effect—a group of hospitals, including Montefiore, challenged the validity of the 2023 Rule.  Compl. ¶¶ 9, 63, 67-96, *Allina IV*, No. 23-CV-2144 (D.D.C. July 24, 2023), ECF No. 1.  This court dismissed the complaint for lack

---

[4] *Available at* https://perma.cc/F7NL-JNDV.

of subject-matter jurisdiction because the plaintiffs had not exhausted their administrative remedies. In the court's view, the hospitals needed to receive revised NPRs calculated in accordance with the 2023 Rule and challenge them through the PRRB before bringing suit. *Allina IV*, 2024 WL 4332061, at *5-8.

## II.    PROCEDURAL HISTORY

In April 2024, a MAC issued Montefiore a revised NPR for Fiscal Year 2006 in which it applied the 2023 Rule to include those receiving Part C benefits in the Medicare fraction and exclude them from the numerator of the Medicaid fraction. ECF No. 1 ¶ 66-67. Montefiore appealed the revised NPR to the PRRB, *id.* ¶ 67, and then filed suit in June 2024, *see id.*

Montefiore claims that application of the 2023 Rule reduced the payment it was entitled to receive for Fiscal Year 2006 by nearly $11 million. *Id.* ¶ 66. Montefiore asks the court to declare the 2023 Rule invalid and set it aside. *Id.* ¶ 101. It also asks the court to direct the Secretary to recalculate its payment for Fiscal Year 2006 based on the pre-2004 policy of excluding Part C days from the Medicare fraction and to pay interest on the additional reimbursement. *Id.* The parties have filed cross-motions for summary judgment, ECF Nos. 19, 21, which are fully briefed, ECF Nos. 19, 21, 22, 24, 25, 28.

Montefiore and other hospitals also have filed related actions challenging the 2023 Rule as applied to other revised NPRs. Compl. ¶ 9, *Montefiore Med. Ctr. v. Becerra*, No. 24-CV-2991 (D.D.C. Oct. 21, 2024), ECF No. 1 (three hospitals challenging seven NPRs); Compl. ¶ 9, *Baystate Med. Ctr., Inc. v. Fink*, No. 25-CV-180 (D.D.C. Jan. 21, 2025), ECF No. 1 (eight hospitals challenging eleven NPRs); Compl. ¶ 9, *Montefiore Med. Ctr. v. Kennedy*, No. 25-CV-627 (D.D.C. Mar. 4, 2025), ECF No. 1 (two hospitals challenging five NPRs). The court has stayed each case pending disposition of Montefiore's first-filed challenge here. Order at 2-3, *Montefiore*,

No. 24-CV-2991 (D.D.C. Dec. 20, 2024), ECF No. 17; Feb. 28, 2025 Minute Order, *Baystate*, No. 25-CV-180; Apr. 15, 2025 Minute Order, *Montefiore*, No. 25-CV-627.

### III.    LEGAL STANDARDS

To resolve summary judgment motions on APA review, the court "sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).   It does not apply the ordinary framework from Federal Rule of Civil Procedure 56, and instead, "[t]he 'entire case' . . . is a question of law." *Am. Bioscience*, 269 F.3d at 1083.   "Summary judgment thus serves as the mechanism for deciding . . . whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Alabama v. U.S. Army Corps of Eng'rs*, 774 F. Supp. 3d 142, 153 (D.D.C. 2025) (quoting *Albino v. United States*, 78 F. Supp. 3d 148, 163 (D.D.C. 2015)).

The APA requires the court to "hold unlawful and set aside" any "agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   "In determining whether an agency's interpretation of its governing statute is contrary to law," the court exercises its "'independent judgment' and 'appl[ies] all relevant interpretive tools' to reach 'the best reading of the statute.'" *Env't Def. Fund v. U.S. Env't Prot. Agency*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 394).

Agency action that is "not contrary to law" must still "be 'reasonable and reasonably explained.'" *Id.* (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).   And it is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Solondz v. Fed. Aviation Admin.*, 141 F.4th 268, 276 (D.C. Cir. 2025) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In conducting its review, the court "may not substitute [its] judgment for that of the Secretary," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and it "may only uphold a rule 'on the basis articulated by the agency' in the rule making record," *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 314 (D.C. Cir. 2018) (quoting *State Farm*, 463 U.S. at 50).

## IV.    DISCUSSION

The parties disagree on three issues: (1) whether the phrase "entitled to [Medicare Part A] benefits" in the Medicare statute requires the inclusion of Part C days in the Medicare fraction and their exclusion from the numerator of the Medicaid fraction; (2) whether the 2023 Rule is impermissibly retroactive or whether it falls within the Medicare statute's allowance for retroactive rulemaking; and (3) whether the 2023 Rule is arbitrary and capricious in violation of the APA. The court agrees with the Secretary on the first issue and Montefiore on the remaining two. Even though the Secretary is correct to interpret the Medicare statute to include Part C days in the Medicare fraction and exclude them from the numerator of the Medicaid fraction, the 2023 Rule reflecting that interpretation is both impermissibly retroactive and arbitrary and capricious. Consequently, the rule is unlawful. The court will therefore grant Montefiore's motion for summary judgment and deny the Secretary's cross-motion for summary judgment.

### A.    Part C Beneficiaries Are Entitled to Part A Benefits Under the Medicare Statute

The first question the court must answer is what "entitled to [Part A] benefits" means in 42 U.S.C. § 1395ww(d)(5)(F)(vi)—specifically, whether that phrase includes individuals who

receive Part C benefits.  The Secretary argues that the 2023 Rule correctly interprets the Medicare statute to require the inclusion of Part C days in the Medicare fraction.  In his view, anyone who either is at least 65 years of age or meets Medicare's disability requirements is "entitled to benefits under [P]art A," which necessarily includes patients who qualify for Part A benefits but elect to enroll in a Part C Medicare Advantage plan.  ECF No. 22, at 14-15.  Montefiore takes a different approach, contending that what matters is not the status of the patient—whether he is entitled to benefits under Part A—but what entity is actually paying for the relevant hospital day—HHS or a private insurance plan.  ECF No. 19-1, at 33.  Under Montefiore's interpretation, only patients who are using Part A benefits to pay for their hospital stay are "entitled to [Part A] benefits" for purposes of the Medicare and Medicaid fractions.  ECF No. 24, at 14-16.  The court concludes that the Secretary has the better reading of the statute.

In ordinary cases of statutory interpretation, the court begins with the statute's text, context, history, and purpose.  *See Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 261 (D.C. Cir. 2025); *United States v. Hansen*, 599 U.S. 762, 775 (2023) (noting that "[s]tatutory history is an important part of [statutory] context"); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022) (explaining that "statutory purpose" can inform a court's interpretation when "that 'purpose is readily apparent from the [statute's] text'" (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011))).  Here, however, the court is not interpreting the statutory text on a blank slate, because the Supreme Court in *Empire Health* already considered and definitively answered—albeit in another context— what it means to be "entitled to [Part A] benefits."  597 U.S. at 428.  While the parties dispute whether *Empire Health* governs this case, ECF No. 19-1, at 32-33; ECF No. 22, at 14-18; ECF No. 24, at 4-10; ECF No. 28, at 2-7, the court would reach the same result whether applying *Empire Health* or conducting its own statutory analysis.

In *Empire Health*, the Court was reviewing the Secretary's interpretation of the DSH adjustment in the 2004 Rule as it concerned whether a patient should be considered "entitled to [Part A] benefits" for purposes of the Medicare fraction when the patient was not using Part A benefits to pay for his hospital stay.  597 U.S. at 432 ("[T]he question presented here [is]: Are patients whom Medicare insures but does not pay for on a given day 'entitled to [Medicare Part A] benefits,' for purposes of computing a hospital's [DSH adjustment]?" (third alteration in original) (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi))); *see Empire Health Found., for Valley Hosp. Med. Ctr. v. Price*, 334 F. Supp. 3d 1134, 1141-42 (E.D. Wash. 2018) (detailing the hospital's challenges to the 2004 Rule and noting that the parties had agreed to remand the challenge to the Secretary's Part C interpretation back to the PRRB given the D.C. Circuit's decision in *Allina I*, 746 F.3d at 1109).[5]  The Court understood the phrase "entitled to [Part A] benefits" to be a "term

---

[5] Although the district court and the Ninth Circuit in *Empire Health* characterized the regulation in question as the "2005 Final Rule," *Empire Health*, 334 F. Supp. 3d at 1141; *Empire Health Found., for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 883, 881-82 (9th Cir. 2020), the parties challenged the same 2004 Rule that the D.C. Circuit had vacated in *Allina I*.  *Compare Empire Health*, 334 F. Supp. 3d at 1144 (describing challenge to 2004 Rule, 69 Fed. Reg. at 49098-99), *and Empire Health*, 958 F.3d at 877 n.1 (same), *with Allina I*, 746 F.3d at 1106-07 (same).  To decide this case, and for purposes of understanding the scope of the *Empire Health* decision, this court accepts how the Supreme Court framed the question presented in *Empire Health*, 597 U.S. at 424 ("[T]he question presented here [is]: Are patients whom Medicare insures but does not pay for on a given day 'entitled to [Medicare Part A] benefits,' for purposes of computing a hospital's disproportionate-patient percentage?" (third alteration in original) (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi))).  The court nevertheless sees some tension between *Allina I* and the lower court decisions in the *Empire Health* cases.  Notwithstanding the Ninth Circuit's correct assessment that the Empire Health Foundation "challenge[d] . . . a different portion of the final rule" that the D.C. Circuit considered in *Allina I*, *see Empire Health*, 958 F.3d at 883; Compl. ¶ 23, *Empire Health*, 334 F. Supp. 3d 1134 (E.D. Wash. 2018) (No. 16-CV-209), ECF No. 1, that strikes the court as potentially a distinction without a difference given that the D.C. Circuit in *Allina I* affirmed the district court's vacatur of "the portion of the 2004 Rule at 69 Federal Register 48916, 49099, that announced the [HHS] Secretary['s] interpretation of the Medicare [DSH] Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in 2010."  Order at 1, *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75 (D.D.C. 2012) (No. 10-CV-1463), ECF No. 44; *see Allina I*, 746 F.3d at 1111 (affirming vacatur).

of art" with a "surprisingly clear meaning" that is consistent "throughout the Medicare statute." *Empire Health*, 597 U.S. at 434-35.

That clear meaning comes from Section 426 of the Medicare statute, which defines those "entitled to hospital insurance benefits under [P]art A" as (1) "[e]very individual who . . . has attained age 65" and is entitled to ordinary social security benefits; and (2) "[e]very individual who . . . has not attained age 65" but who has been entitled to federal disability benefits for at least 24 months.  42 U.S.C. § 426(a)-(b); *see Empire Health*, 597 U.S. at 435-36.  As the Court explained, the entitlement to Part A benefits under the Medicare statute is "automatic" based on age or disability: "Turn 65 or receive disability benefits for 24 months, and you have an entitlement to Part A benefits—because the latter is, according to the statute, simply a legal status arising from the former." *Empire Health*, 597 U.S. at 436.  Put differently, the "entitlement [that] arises when a person meets the basic statutory qualifications . . . *never goes away*." *Id.* at 437 (emphasis added).

The Court understood that its interpretation preserved the structure of the Medicare statute and gave meaning to the "beneficiary protections Congress wrote into law." *Id.* at 439.  If entitlement to Part A benefits were instead an "on-again, off-again" condition that attached only when the Medicare program directly paid for care, "beneficiaries would lose important rights and protections"—they would be unable to "enroll in other Medicare programs," HHS would have "no obligation" to provide them with an "annual notice [of] . . . program benefits," and Medicare Advantage plans could distribute "misleading marketing materials." *Id.* at 437-38.

With this definition in mind—and this understanding of the Medicare statute's structure and purpose—the Court easily concluded that all individuals meeting Part A's basic eligibility

requirements must be counted in the Medicare fraction "regardless of whether they are receiving Medicare payments for part or all of a hospital stay." *Id.* at 445.

To be sure, *Empire Health* did not expressly address the Part C question presented here, leading the parties to debate whether this court could interpret the phrase "entitled to [Part A] benefits" differently for individuals who are eligible for Part A benefits but forgo them in favor of Part C benefits. ECF No. 19-1, at 32-33; ECF No. 22, at 14-18; ECF No. 24, at 4-10; ECF No. 28, at 2-7. In making its argument, Montefiore disputes what the Court decided in *Empire Health*. It asserts that the Court "merely '*approve[d]*'" the Secretary's interpretation of the Medicare statute, ECF No. 19-1, at 33 (quoting *Empire Health*, 597 U.S. at 428), and did not "disturb[]" the D.C. Circuit's holding in *Northeast Hospital* that "the statute is ambiguous" with respect to its treatment of Part C days, *id.* at 31-32; *see* ECF No. 24, at 7 ("*Northeast Hospital* remains binding even after *Empire* [*Health*] and *Loper Bright* . . . .").

Montefiore's attempt to cast *Empire Health* as distinguishable and *Northeast Hospital* as binding falls flat. The issue in *Northeast Hospital* was whether the Secretary's interpretation of the Medicare fraction was "reasonable" under Section 1395ww(d)(5)(F)(vi), *Ne. Hosp. Corp.*, 657 F.3d at 4-5, not whether the statute had one "best reading," *Loper Bright*, 603 U.S. at 400. Accordingly, *Northeast Hospital* does not control the outcome in this case, which presents the distinct question whether the Medicare statute *requires* including Part C patient days in the Medicare fraction and excluding them in the numerator of the Medicaid fraction.

But regardless of whether *Empire Health* is mandatory or persuasive authority, it follows from the Supreme Court's interpretation of the Medicare statute that any individual who is over 65 or receiving disability benefits for 24 months is "entitled to [Part A] benefits" for purposes of Section 1395ww(d)(5)(F)(vi) even when he opts out of receiving Part A benefits and enrolls in

Part C benefits.  Only the Secretary's interpretation is consistent with the Supreme Court's view of the Medicare statute as a whole and its understanding of entitlement to Part A benefits as an automatic, legal status.  Montefiore's reading, on the other hand, cannot be squared with the statutory text and context.

For the same reasons the Supreme Court in *Empire Health* understood that the Medicare statute as a whole supported the Secretary's interpretation, the statute is similarly preserved only by understanding that Part C enrollees remain entitled to Part A benefits even when they elect to receive Part C benefits.  *See Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (alteration in original) (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 320 (2014))).  To begin, entitlement to Part A benefits is a precondition for enrolling in Part C benefits.  A person is only "eligible" to choose Part C benefits in lieu of Part A benefits if he is "entitled to [Part A] benefits and enrolled [in Part] B" coverage."  42 U.S.C. § 1395w-21(a)(3); *see* 42 C.F.R. §§ 422.50(a)(1), 422.62(a)(1).  For Montefiore's interpretation to work, a person who *is* entitled to Part A benefits would have to relinquish that entitlement once he enrolls in a Medicare Advantage plan.  *See* ECF No. 24, at 14 ("[P]art C enrollees are thus categorically not entitled to [P]art A benefits because . . . they no longer qualify for benefits under the program.").  That understanding is foreclosed by the Part A entitlement provision, which makes "*[e]very individual*" who meets the age requirement or the disability requirement entitled to Part A coverage.  42 U.S.C. § 426(a)-(b) (emphasis added).  Montefiore does not argue that, by enrolling in Part C, a patient no longer meets the age requirement or the disability requirement that guarantees automatic Part A entitlement—nor could it, as meeting one of those requirements is a condition for Part C eligibility in the first instance.  This sometimes-in-sometimes-out view of

entitlement to Part A benefits is precisely the one the Supreme Court rejected in *Empire Health*, 597 U.S. at 438.

The enrollment process itself functions only when Part A entitlement is automatic and ongoing. Perhaps the "most significant[]" of the "rights and protections" that Medicare beneficiaries have is the autonomy to choose alternative or additional benefits and coverage. *Id.* The Secretary therefore must "establish a process" through which a Part C-eligible individual may "elect[]," 42 U.S.C. § 1395w-21(c)(1), "to receive benefits," *id.* § 1395w-21(a)(1). Enrollees must also be allowed to "terminate" their Part C election. *Id.* § 1395w-21(c)(2)(B). Whether in an "annual, coordinated election period," *id.* § 1395w-21(e)(3)(A), or in a "[s]pecial election period[]," a Part C enrollee may "discontinue an election of a [Medicare Advantage] plan . . . and make a new election," *id.* § 1395w-21(e)(4). Each time the Part C enrollment provision mentions a person's "election," the choice is the same: the "original [M]edicare fee-for-service program"—that is, Part A—or "[re-]enrollment in a [Part C] plan." *Id.* § 1395w-21(a)(1)(A)-(B).

On Montefiore's interpretation, once an individual opts out of Part A and enrolls in Part C, he could never return to Part A. That is because, as the court has already noted, a person may only "elect"—in this case, switch back to—Part A if he remains eligible for Part C, which requires him to be "entitled to [Part A] benefits." *Id.* § 1395w-21(a)(1), (3). This disruptive view of Part A entitlement is untenable, and it frustrates the statute's design to give Medicare patients autonomy to change plans. Congress envisioned that people might have changing preferences, especially when they are new to Medicare. Whenever a newly eligible Medicare beneficiary chooses Part C right away, the statute allows him to "discontinue" that election and "elect coverage under the original fee-for-service plan" at "any time during the [first year]." *Id.* § 1395w-21(e)(4).

19

Interpreting the DSH adjustment provision in a manner that is consistent with the entire statute's preference for flexible decisionmaking matters because—as anyone who has navigated public or private health insurance might know—health care is complicated, especially as a person's health and medical needs change from year to year. The Medicare statute allows someone receiving Part A and Part B benefits to enroll in a private Part C plan during the next annual window, and then elect again to receive Part A and Part B benefits a year later. Congress could not have wanted patients to lose their entitlement to Part A benefits simply because they elected, in a given year, to enroll in a Part C plan.

To conclude otherwise would also undermine other Medicare protections guaranteed to anyone with the "automatic" status of entitlement to Part A benefits. Aside from patient choice concerning Part A or Part C benefits, those in the Medicare program have the option to enroll in Part D, which provides optional "prescription-drug benefits." *Empire Health*, 597 U.S. at 438. Like Part C eligibility, a person's ability to obtain Part D benefits is contingent upon his entitlement to Part A benefits or enrollment in Part B. *Id.* at 437-38; 42 U.S.C. § 1395w-101(a)(3)(A). Under Montefiore's view of the statute, a patient *loses* his entitlement to Part A benefits the moment he enrolls in a Medicare Advantage plan, ECF No. 19-1, at 33-34; ECF No. 24, at 13-20, which would render him unable to obtain Part D's prescription-drug benefits. That cannot be correct because Congress expressly allows any Part D-eligible individual "who is enrolled in [a Medicare Advantage] private fee-for-service plan . . . that does *not* provide qualified prescription drug coverage [to] obtain [such] coverage through enrollment in [Part D]." 42 U.S.C. § 1395w-101(a)(1)(B)(iii) (emphasis added); *see id.* § 1395w-21(a)(1) (permitting anyone "entitled to" choose Part C benefits to also "elect qualified prescription drug coverage" under Part D).

Against this coherent and integrated reading of the Medicare statute, Montefiore offers a textual argument that, on first blush, looks promising. It points to two isolated provisions in Section 1395ww, both of which refer to those "entitled to benefits under [P]art A" *or* "enrolled with a Medicare+Choice organization under [P]art C." ECF No 24, at 14 (quoting 42 U.S.C. § 1395ww(d)(11)(B), (l)(2)(C)(i)).[6] This either/or framing of entitlement to Part A and enrollment in Part C suggests, in Montefiore's view, that a Medicare beneficiary cannot be enrolled in Part C while maintaining his entitlement to Part A. Read in "complete isolation," these two provisions theoretically could favor Montefiore's interpretation. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 533 (D.C. Cir. 2025) (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023)). Even then, the two provisions do not undermine the Supreme Court's view that the DSH fractions take a meaning that is consistent "throughout the Medicare statute." *Empire Health*, 597 U.S. at 434. After all, a court "has a 'duty to construe statutes, not isolated provisions.'" *Turkiye Halk Bankasi A.S.*, 598 U.S. at 275 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)). Montefiore offers no persuasive reason why an eligible patient's automatic entitlement to Part A benefits would cease when he enrolls in Part C.

Far more problematic for Montefiore is that its textual argument lacks merit. Instead, both subsections, read in their entirety and in the context of the statutory scheme, are consistent with the Secretary's interpretation, which understands "entitled to [Part A] benefits" to take the same "mean[ing]" throughout the Medicare statute." *Empire Health*, 597 U.S. at 434. Section 1395ww covers "[p]ayments to hospitals for inpatient services" and details a list of specific payments that

---

[6] Recall that Medicare+Choice is the previous name for the Part C Medicare Advantage program. *See supra* note 2.

hospitals receive—like the DSH fractions, 42 U.S.C. § 1395ww(d)(5)(F)(vi)—for their services to Medicare beneficiaries.  The two provisions Montefiore identifies concern so-called risk-sharing contracts.  Beginning in the Health Maintenance Organization Act of 1973, Pub. L. No. 93-222, 87 Stat. 914, Congress permitted "private health maintenance organizations ('HMOs') to provide replacement coverage for Medicare-eligible individuals," *Care Choices HMO v. Engstrom*, 330 F.3d 786, 787 (6th Cir. 2003).  HMOs therefore supplant Medicare Part A's basic fee-for-service model, under which HHS pays hospitals directly for services they provide, in favor of a "managed care system." *Am. Chiropractic Ass'n v. Shalala*, 108 F. Supp. 2d 1, 3 (D.D.C. 2000).  An HMO covers Part A and Part B services in exchange for "a monthly, predetermined [payment] for each enrollee, regardless of whether the enrollee receives services, pursuant to [Section 1395mm(g)] 'risk contracts' entered into between the Secretary and the organization." *Id.*  Risk-sharing contracts are one of Congress's efforts "to reduce the cost of the Medicare program." *Care Choices HMO*, 330 F.3d at 787.  Another effort, also in Section 1395mm, is the reasonable cost reimbursement contract, which "reimburse[s] [a qualifying HMO] for the 'reasonable cost' of the covered services it provides to its Medicare beneficiaries." *Rocky Mountain Health Maint. Org., Inc. v. Price*, 297 F. Supp. 3d 152, 154 (D.D.C. 2018) (quoting 42 U.S.C. § 1395mm(h)).

In Section 1395ww(d)(11)—the first provision Montefiore marshals to support its interpretation of the DSH fraction—Congress directed additional funds "for managed care enrollees."  Starting in 1998, certain hospitals with "approved medical residency training program[s]" were entitled to money "for each applicable discharge." 42 U.S.C. § 1395ww(d)(11)(A).  An applicable discharge is "the discharge of any individual who is enrolled under a risk-sharing contract with an eligible organization under [S]ection 1395mm of [the

Medicare statute] and who is entitled to benefits under [P]art A *or* any individual who is enrolled with a Medicare+Choice organization under [P]art C." *Id.* § 1395ww(d)(11)(B) (emphasis added).

And in Section 1395ww(l)—which covers the second provision Montefiore believes undermines the Secretary's interpretation—Congress directed the Secretary to pay "for nursing and allied health education for managed care enrollees." Beginning in 2000, hospitals that received reimbursements for reasonable costs of "approved educational activities for nurse and allied health professional training" became entitled to "an additional payment." *Id.* § 1395ww(l)(1). How much each hospital receives depends on a ratio that in turn depends in part on "the total number of inpatient days . . . attributable to services furnished to individuals who are enrolled under a risk sharing contract with an eligible organization under [S]ection 1395mm of [the Medicare statute] and who are entitled to benefits under [P]art A *or* who are enrolled with a Medicare+Choice organization under [P]art C." *Id.* § 1395ww(l)(2)(C)(i) (emphasis added).[7]

Neither Section 1395ww(d)(11)(B) nor 1395ww(l)(2)(C)(i) suggests, as Montefiore contends, that once someone enrolls in Part C, he forgoes his entitlement to Part A benefits. The provisions plainly target two subgroups for calculating additional payments to hospitals: (1) those who have Section 1395mm risk-sharing contracts *and* who are entitled to Part A benefits; and (2) those who are enrolled in a Medicare+Choice, or Part C, program. *Id.* § 1395ww(d)(11)(B), (l)(2)(C)(i). The Medicare statute draws this dividing line for a simple but important

---

[7] Section 1395ww(1)(2)(A), when directing the Secretary to estimate payments owed to qualifying hospitals, cross-references Section 1395ww(h)(3)(D). Section 1395ww(h)(3)(D) also requires the Secretary to provide payments "for services furnished to individuals who are enrolled under a risk-sharing contract with an eligible organization under [S]ection 1395mm of [the Medicare statute] and who are entitled to [P]art A *or* with a Medicare+Choice organization under [P]art C." *Id.* § 1395ww(h)(3)(D)(i) (emphasis added). Montefiore does not identify this subsection, but the court notes it for completeness and concludes that it does not support Montefiore's interpretation for the same reasons that neither Section 1395ww(d)(11)(B) nor Section 1395ww(l)(2)(C)(i) does.

reason—Section 1395's scheme for risk-sharing contracts is a legacy system that predates Congress's enactment of the Medicare+Choice program. Put differently, risk-sharing contracts, as set forth in Section 1395mm, do not apply to Part C. *See* 42 U.S.C. § 1395mm(k)(4) (setting forth requirements for "organizations with risk-sharing contracts under [Section] 1395mm" that "apply . . . in the same manner as they apply to Medicare+Choice organizations under [P]art C"). Medicare Advantage is, as its predecessor Medicare+Choice was, by definition a departure from the fee-for-service model and therefore serves the same purpose as the Section 1395mm and HMO model. Once Congress "established" Medicare+Choice as the "new 'Part C'" in 1997, it "gradually . . . phased out [the HMO program] in favor of the 'Medicare+Choice'" program. *Am. Chiropractic Ass'n*, 108 F. Supp. 2d at 3.

Section 1395mm makes this division clear. It contemplates that reasonable cost reimbursement contracts may be "extended or renewed indefinitely" or, in some cases, "converted . . . and offered as a Medicare Advantage plan under [P]art C." 42 U.S.C. § 1395mm(h)(5)(C)(i), (iv)(III). And it prohibits the Secretary from "enter[ing] into any risk-sharing contract[s]" once he has established "standards for Medicare+Choice organizations," *id.* § 1395mm(k)(1)(A), except for "individual[s] . . . enrolled in [P]art B only," *id.* § 1395mm(k)(2). The bottom line is that—as far as the 2023 Rule is concerned—the two provisions that Montefiore contends "reflect [the] 'either/or' nature of [P]art A eligibility and [P]art C program enrollment" do no such thing. ECF No. 24, at 14. Instead, they simply reflect Congress's effort to direct the Secretary to make certain reimbursement calculations based on the entire population of "managed care enrollees," 42 U.S.C. § 1395ww(d)(11), (l)—irrespective of whether a person is enrolled in a legacy Part A HMO that has a risk-sharing contract, or in Part C.

The Secretary's interpretation of the DSH fraction is thus entirely consistent with this part of the Medicare statute.

Lacking any other textual hook, Montefiore contends that Part C days are "not days for which patients are entitled to" Part A because private Medicare Advantage plans, and not Part A, pay "for [those] services." ECF No. 19-1, at 33. To support that reading, Montefiore relies solely on then-Judge Kavanaugh's concurrence in *Northeast Hospital*. *Id.* at 34. But the concurring opinion's logic—that a person cannot be "both enrolled in Part C and entitled to Part A benefits *for the same day*," 657 F.3d at 19 (Kavanaugh, J., concurring)—is irreconcilable with the Supreme Court's understanding that "entitlement to Part A benefits . . . is, according to the statute, simply a legal status," *Empire Health*, 597 U.S. at 436. The Court in *Empire Health* expressly rejected this "who-paid-for-a-day-of-care test" as an interpretation that upends the "binary" structure of the Medicare and Medicaid fractions. *Id.* at 443. Instead, the "dividing line HHS uses—do you qualify for Medicare?—mirrors the statute's binary, population-focused framework." *Id.* at 442-43. The same is true here. "[P]ing-ponging [patients] back and forth between the two fractions based on the happenstance of actual Medicare payments" bears no connection to a patient's financial status—the very metric that the DSH fractions are designed to capture in order to facilitate accurate reimbursements for hospitals serving low-income populations. *Id.* at 443.

For these reasons, "entitled to [Part A] benefits" in the Medicare fraction means "qualifying for those benefits, and nothing more." *Id.* at 442. The Secretary therefore interprets the statute correctly in the 2023 Rule.

**B.      The 2023 Rule is Impermissibly Retroactive**

**1.      The 2023 Rule is Retroactive**

In the Secretary's view, the court reaches the end of its inquiry once it agrees with his interpretation of the Medicare statute.  ECF No. 22, at 14.  The 2023 Rule, the Secretary asserts, cannot be retroactive if the statute requires including Part C days in the Medicare fraction and excluding them in the numerator of the Medicaid fraction.  *Id.* at 21.  The court disagrees.  The question whether the 2023 Rule appropriately construes the statute is wholly separate from whether it has retroactive effect.  Whatever the court understands is the best reading of "entitled to [Part A] benefits"—and even though statutory "meaning is fixed at the time of enactment," *Loper Bright*, 603 U.S. at 400 (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))—the 2023 Rule operates by applying a new policy of including Part C days in the DSH adjustment calculation for Fiscal Years 2004 through 2013.  For regulated entities, the *effect* of imposing the Secretary's new interpretation on settled conduct is what makes the 2023 Rule quintessentially retroactive.

"To determine whether a rule is impermissibly retroactive, '[the court] first look[s] to see whether it effects a substantive change from the agency's prior regulation or practice.'"  *Ne. Hosp. Corp.*, 657 F.3d at 14 (quoting *Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 860 (D.C. Cir. 2002)).  A rule that "departs from established practice" is retroactive if it "'alter[s] the *past* legal consequences of past actions.'"  *Id.* (alteration in original) (quoting *Mobile Relay Assocs. v. Fed. Commc'ns Comm'n*, 457 F.3d 1, 11 (D.C. Cir. 2006)).  "Put differently, '[i]f a new rule is "substantively inconsistent" with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively.'"  *Id.* (alteration in original) (quoting *Arkema Inc. v. Env't Prot. Agency*, 618 F.3d 1, 7 (D.C. Cir. 2010)).  Or, as the

D.C. Circuit has put it, any "new regulation [that] is substantively inconsistent with a prior regulation, prior agency practice, or any Court of Appeals decision rejecting a prior regulation or agency practice, . . . is retroactive as applied to pending claims." *Nat'l Mining Ass'n*, 292 F.3d at 860.

The Secretary's efforts to avoid this precedent are unavailing. The Secretary proclaims that the "'clear meaning' of the [DSH] statute" makes "such questions" about retroactivity "no longer particularly relevant." ECF No. 22, at 20 (quoting *Empire Health*, 597 U.S. at 434). He suggests that this understanding of retroactivity is required by the Supreme Court's decision in *Loper Bright*. As the Secretary notes, "the whole point of having written statutes [is that] 'every statute's meaning is fixed at the time of enactment.'" ECF No. 22, at 23 (quoting *Loper Bright*, 603 U.S. at 400). But aside from his appeal to *Loper Bright*, the Secretary offers no support for the notion that once a court interprets a statute, an agency has an automatic license to apply that interpretation retroactively through the rulemaking process.

The court declines the Secretary's invitation to read a *Loper Bright*-sized hole into the Supreme Court's and D.C. Circuit's retroactivity precedent. On the Secretary's read, *Loper Bright* overturned *Chevron* and silently did the same for *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)—the Supreme Court's seminal precedent on retroactive regulations—and its progeny. No court has endorsed this understanding of *Loper Bright*, which concerned only the judiciary's responsibility to interpret statutes rather than defer to an agency's reasonable interpretation. 603 U.S. 369, 400-01. In any event, only the Supreme Court has the "prerogative . . . to overrule one of its precedents." *United States v. Hatter*, 532 U.S. 557, 567 (2001) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)). Unless and until the Court imposes a new framework for assessing an agency's retroactive rule that is premised on a new interpretation of a statute, this court is

duty-bound to "follow the case which directly controls." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Here, that case is *Bowen* and the retroactivity principles it announced.

Nor can the Secretary's *Loper Bright* argument be squared with the text of the Medicare statute. His approach would mean that whenever HHS reinterprets the statute and a court holds that the agency adopted the best reading of the provision, there are no retroactivity implications because the "statute's meaning [was] fixed at the time of enactment." ECF No. 22, at 23 (quoting *Loper Bright*, 603 U.S. at 400). Aside from running afoul of basic retroactivity principles, that approach would nullify the statutory scheme Congress designed. In the Medicare statute's retroactivity provision, any "substantive change in regulations, manual instructions, *interpretative rules*, *statements of policy*, or guidelines of general applicability" may not be applied retroactively unless one of the two exceptions is met. 42 U.S.C. § 1395hh(e)(1)(A) (emphasis added). The law thus plainly envisions that the Secretary might reinterpret a provision or issue a "statement of policy" to "'le[t] the public know [the agency's] current . . . adjudicatory approach' to a critical question involved in calculating payments for thousands of hospitals nationwide." *Allina II*, 587 U.S. at 572 (alterations in original) (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)). In such an instance, Congress opted for the retroactivity exceptions to condition the Secretary's ability to apply that interpretation retroactively. The Secretary offers no reason why the court should adopt an interpretation that "nullif[ies] [part of] the [Medicare statute]," *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 130 (2016), by reading "interpretive rules" and "statements of policy" out of Section 1395hh(e)(1)(A).

Under longstanding retroactivity precedent that this court is bound to apply, the 2023 Rule plainly qualifies as retroactive. The Secretary issued it in June 2023, yet it "creates a policy" with

respect to the "treatment" of Part C days "for discharges occurring prior to October 1, 2013." 2023 Rule, 88 Fed. Reg. at 37772. As the D.C. Circuit acknowledged in *Northeast Hospital*, the court must compare "the Secretary's treatment of [Part C] days *during the fiscal year[] in dispute*" against the "legal consequences of treating low-income patients" under the new rule. 657 F.3d at 16-17. Montefiore challenges HHS's disproportionate patient percentage calculation from Fiscal Year 2006. ECF No. 1 ¶¶ 9, 63 n.2. Although in August 2004 the Secretary had issued a rule containing a preamble that discussed including Part C days in the Medicare fraction, 2004 Rule, 69 Fed. Reg. at 49093, 49099, that rule failed to revise the regulatory text, meaning the new interpretation was not formally adopted until 2007, Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed. Reg. 47130, 47384 (Aug. 22, 2007) ("2007 Rule"). Montefiore cites the Medicare fractions CMS published in 2005 and 2006, which "continued to exclude Part C days," to support its argument, ECF No. 1 ¶ 34, and the Secretary does not meaningfully contest this evidence, ECF No. 2 ¶ 34 (calling Montefiore's evidence a "characterization of agency guidance documents"). Nor could he: in the 2007 Rule, the Secretary admitted that it was *this* rule—and not the one issued in 2004—that would "effectuate the policy" of including Medicare Part C days in the Medicare fraction. 2007 Rule, 72 Fed. Reg. at 47384. The upshot of this policy landscape is that during the fiscal year disputed here, Montefiore was subjected to a reimbursement practice with diametrically opposed legal consequences to those imposed by the 2023 Rule.

The Secretary tries a different tack on reply. Responding to Montefiore's argument about the Medicare statute's notice-and-comment provisions, the Secretary selectively quotes the Supreme Court's *Allina II* decision to argue that the 2023 Rule did not "'establis[h] or chang[e]' a substantive legal standard—and so didn't require notice and comment under § 1395hh(a)(2)—

because the *statute* itself required [the Secretary] to count Part C patients in the Medicare fraction." ECF No. 28, at 11 (alterations in original) (quoting *Allina II*, 587 U.S. at 583). The dispute in *Allina II* concerned whether HHS's retroactive "statement of policy," a 2014 announcement of the 2012 Medicare fractions, was subject to Section 1395hh(a)(2)'s notice-and-comment requirement. 587 U.S. at 568, 572. That provision mandates notice and comment whenever the Secretary "establishes or changes *a substantive legal standard*." 42 U.S.C. § 1395hh(a)(2) (emphasis added). The Supreme Court agreed with the hospitals that notice and comment were required. It noted, however, that the government had not made the argument that "the *statute* itself required [the Secretary] to [include] Part C [days]." *Allina II*, 587 U.S. at 583. The Secretary now advances that argument here.

This portion of *Allina II* does little to advance the Secretary's position that once a "statute already dictates [a] result, . . . there is no need to apply a rule at all—retroactively or otherwise." ECF No. 28, at 12. To see why, compare the notice-and-comment provision and the retroactivity exceptions in Section 1395hh. Once the Medicare statute is best read to require the Secretary to include Part C patients in the Medicare fraction, his interpretation announcing as much may not "'establis[h] or chang[e]' a *substantive legal standard*" as the subsection on notice and comment contemplates because, as the *Loper Bright* theory goes, that was the substantive legal standard the whole time. *See Allina II*, 587 U.S. at 583 (emphasis added) (quoting 42 U.S.C. § 1395hh(a)(2)). *Allina II* expressly leaves open the question whether notice and comment is required in such a circumstance. But even if notice and comment were not necessary, the Medicare statute's retroactivity provision would still apply. That subsection, 42 U.S.C. § 1395hh(e)(1)(A), addresses substantive changes in agency *action*, not to a legal standard. While a legal standard may be

"fixed" when a statute is enacted, an agency's decision to adopt it decades later and apply it to past conduct is subject to Section 1395hh(e)(1)(A)'s allowances for retroactivity.

The 2023 Rule is therefore plainly retroactive. Before it was issued, different legal standards governed Montefiore's conduct from seventeen years prior. The Secretary's new policy "affects [Montefiore's] right to payment," *Allina II*, 587 U.S. at 573, and must be declared unlawful unless it complies with an "express statutory grant" of retroactive rulemaking authority, *Bowen*, 488 U.S. at 208-09.

## 2.    The 2023 Rule Does Not Satisfy the Medicare Statute's Criteria for Retroactive Rulemaking

Because the 2023 Rule is retroactive, it must comply with the Medicare statute's exceptions for retroactive rulemaking.[8]    The statute generally disfavors retroactivity, except under two

---

[8] Montefiore makes two threshold arguments for why the Secretary cannot rely on the Medicare statute's retroactivity exceptions. Both are wrong. First, Montefiore contends that the 2023 Rule cannot apply to conduct predating the notice-and-comment period because the statute requires an opportunity for public comment before it can "take effect." ECF No. 19-1, at 22-25 (quoting 42 U.S.C. § 1395hh(a)(2), (a)(4)); ECF No. 24, at 20-28. That argument fails because Section 1395hh unambiguously uses "take effect" to mean the first date after a final rule is *promulgated* on which the Secretary may begin enforcement—not the first date on which the rule can impose substantive legal consequences on conduct. *See* 42 U.S.C. § 1395hh(e)(1)(B) (allowing the Secretary to impose a retroactive substantive change that "take[s] effect" thirty days after he "has issued or published . . . [it]"); *Vanda Pharms., Inc. v. U.S. Food & Drug Admin.*, No. 24-1049, 2025 WL 2371368, at *4 (D.C. Cir. Aug. 15, 2025) (noting that courts generally interpret terms consistently throughout a statute, especially when they are used "within the same section of a statute[] and pertain to parallel processes"). Not only does Montefiore's understanding of the notice-and-comment scheme flout the plain text, but it would nullify the retroactivity exceptions entirely. If the Secretary could not apply a rule to conduct occurring before the notice-and-comment window, no substantive change would ever be retroactive. Montefiore offers no compelling reason to disrespect Congress's choice to give the Secretary retroactive rulemaking authority in limited circumstances. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024) (explaining that "[p]roper respect for Congress" requires not "lightly assuming" that a statutory provision should be voided of significance). Second, Montefiore asserts that the statute's retroactive exceptions apply only when the Secretary "'change[s]'" a substantive

*(continued on next page)*

circumstances: (1) where the Secretary "determines" that "retroactive application" of a "substantive change in regulations" is "necessary to comply with statutory requirements," or (2) where the Secretary "determines" that "failure to apply the change retroactively would be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A). The 2023 Rule satisfies neither criterion.

### a.    *Retroactivity is not necessary to comply with HHS's statutory requirements*

Congress granted the Secretary authority to make substantive changes through retroactive regulations if he determines that the retroactive application is "necessary to comply with statutory requirements." 42 U.S.C. § 1395hh(e)(1)(A)(i). According to Montefiore, the Secretary has "historically" interpreted this retroactivity exception to apply "only where the Medicare statute *affirmatively requires* that the rule take effect as of a certain date before the notice and comment, specifically through a congressionally mandated effective date of a payment change." ECF No. 19-1, at 29. Montefiore offers examples of when the Medicare statute required implementation by a certain date, which the agency missed, thereby necessitating retroactive rulemaking. *Id.* at 29-30. But it argues that retroactivity is not "required by the statutory obligation

---

standard, not, like here, when he "establish[es]" a new one. ECF No. 19-1, at 25-27 (quoting 42 U.S.C. § 1395hh(e)(1)(A)); ECF No. 24, at 28-30. That argument fails even a cursory inspection. Even accepting the premise, Montefiore concedes that, under D.C. Circuit precedent, the 2023 Rule "was, in fact, a *change*" to the "already established . . . pre-2004 policy and practice on [P]art C days." ECF No. 19-1, at 26 (emphasis added). Its response that the 2023 Rule may only be upheld, if at all, on the *Secretary's* characterization of the regulation as "'establish[ing]' a standard on [P]art C days," *id.* at 25 (first alteration in original), conspicuously ignores the Secretary's statement in the final rule that he "believe[d]" the new regulation "effect[ed] a 'substantive change' to the DSH regulations," 2023 Rule, 88 Fed. Reg. at 37785. This is not a case involving "'post hoc rationalizations' for [the Secretary's] decisions." *Clean Wis. v. Env't Prot. Agency*, 964 F.3d 1145, 1161 (D.C. Cir. 2020) (per curiam) (quoting *State Farm*, 463 U.S. at 50). Accordingly, the court rejects Montefiore's threshold arguments, which conflict with the Medicare statute's plain text and contradict the administrative record, and considers whether the Secretary's invocation of the retroactivity exceptions complies with the APA.

to make DSH payments because the agency can continue making the payments under the pre-2004 standard."  *Id.* at 30.

Unsurprisingly, the Secretary advances a different view.  First, he contends that, under the APA, the court may only decide whether his invocation of the retroactivity exception was arbitrary or capricious.    ECF No. 22, at 28-29;  ECF No. 28, at 18.    Second, he explains that HHS "determined" in the 2023 Rule that retroactivity is necessary "to comply with the statutory requirement to make DSH payments."[9]  2023 Rule, 88 Fed. Reg. at 37774; *see* ECF No. 22, at 29; ECF No. 28, at 18.  This is because, prior to the 2023 Rule, the agency had no "policy" pertaining to pre-2014 DSH fractions and the Secretary was required to implement one.    ECF No. 22, at 29-30.  As the argument goes, *failing* to apply the new interpretation retroactively would require HHS to "'codify' a policy that violates the 'clear meaning' of the statute by treating individuals who meet the basic statutory entitlement criteria as if they were not entitled to benefits under Part A."  *Id.* at 30.  Any such policy, the Secretary maintains, would be unlawful under *Allina II* for lack of notice and comment.  *Id.*

The Secretary is wrong on the relevant APA standard.  In his assertion that the court is limited to reviewing the invocation of a Section 1395hh(e)(1)(A)(i) exception only for "arbitrary" and "capricious" agency action, the Secretary misunderstands both Montefiore's argument and the statutory limits on his authority to justify retroactive rulemaking.  The APA requires a court to set aside a final rule that is arbitrary or capricious, but it also permits review for any "abuse of

---

[9] The Secretary also reasoned that retroactivity was needed to "address any potential statutory gap" that existed after *Empire Health*.  2023 Rule, 88 Fed. Reg. at 37774; *see* ECF No. 28, at 21.  That justification is foreclosed by the court's determination that the DSH statute requires the Secretary, at least on a prospective basis, to include Part C days in the Medicare fraction and exclude them from the Medicaid fraction.

discretion" or agency action "otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). Whereas the Secretary argues that his decision is entitled to deference under arbitrary and capricious review, the court understands Montefiore to contest the Secretary's *interpretation* of Section 1395hh(e)(1)(A)(i).  The Secretary "has no power to 'exercise [his] authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *Crowley*, 143 F.4th at 531 (quoting *Food & Drug Admin. v. Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)).  Montefiore's two arguments concern its disagreement with the Secretary about what statutory duties he has and what "substantive change[s]" the Medicare statute considers "necessary" to comply with them.  42 U.S.C. § 1395hh(e)(1)(A)(i).

Properly framed, this is not a dispute about whether the Secretary's "necessary to comply" decision was arbitrary or capricious.  Rather, it concerns what the statutory allowance for retroactive rulemaking "permits," ECF No. 19-1, at 29, which is an argument that the Secretary's "interpretation of [HHS's] governing statute is contrary to law," *Institutional S'holder Servs., Inc. v. Sec. & Exch. Comm'n*, 142 F.4th 757, 766 (2025).  In resolving that challenge, the court "must 'exercise [its] independent judgment in determining the meaning of statutory provisions.'"  *Id.* (quoting *Loper Bright*, 603 U.S. at 394).  The court agrees in part with Montefiore, which is enough to warrant summary judgment in the hospital's favor.[10]

The central thrust of the Secretary's argument on the "necessary to comply" exception is untenable.  He claims that retroactive rulemaking is necessary because, without the 2023 Rule,

---

[10] The court is not persuaded by Montefiore's argument that retroactive rulemaking is permissible to comply with a statutory obligation "only where the Medicare statute *affirmatively requires*" implementation of a rule by a certain date.  ECF No. 19-1, at 29.  While Montefiore offers three examples of HHS's retroactive rulemaking on that basis, it provides no support for the claim that the statute requires this construction.

HHS would have no policy in place to make statutorily mandated payments *or* the agency would have to initiate notice and comment to finalize a rule that violates the statute's plain text. 2023 Rule, 88 Fed. Reg. at 37782-83; *see* ECF No. 22, at 29-30; ECF No. 28, at 18.  On the first point, the Secretary's position cannot be squared with the D.C. Circuit's view in *Northeast Hospital*, in which the Court concluded that the Secretary had a pre-2004 "practice of excluding [Part C] days from the Medicare fraction."  657 F.3d at 16-17; *see Allina I*, 746 F.3d at 1108 ("[O]ur holding in *Northeast Hospital* . . . explicitly stated that the Secretary did have a prior practice of excluding Part C days from the Medicare fraction.").  And, as documented above, *see supra* Section IV.B.1, Montefiore has offered evidence consistent with *Northeast Hospital* that concerns "the Secretary's treatment of [Part C] days *during the fiscal year[] in dispute*," *Ne. Hosp. Corp.*, 657 F.3d at 16.

Not only are the Secretary's assertions contradicted by the record and D.C. Circuit precedent discussing HHS's prior treatment of Part C days, they also flout "basic tenets of administrative law." *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987), *aff'd*, 488 U.S. 204 (1988).  "[T]he effect of invalidating an agency rule is to '*reinstat[e]* the rules previously in force.'"  *Id.* (second alteration in original) (quoting *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam)); *see id.* (collecting cases).[11] Vacatur of the 2023 Rule would "*automatically* resurrect[]" the prior policy, *United Steel v. Mine*

---

[11] Two judges in this district have "identified tension" between *Action on Smoking & Health* and "language in a[nother] D.C. Circuit case decided the same year" that "expressed a general preference" for allowing the agency to devise a new rule rather than reinstating the prior one.  *Am. Fed'n of Lab.-Cong. of Indus. Orgs. v. Chao*, 496 F. Supp. 2d 76, 83 n.1 (D.D.C. 2007) ("*AFL-CIO*"); *see Oceana Inc. v. Evans*, 389 F. Supp. 2d 4, 6 (D.D.C. 2005).  The view that the court relies on here "enjoys support" from the D.C. Circuit's later decision in *Bowen* and "is consistent with the unanimous body of law from other circuits."  *AFL-CIO*, 496 F. Supp. 2d at 83 n.1; *see Oceana, Inc.*, 389 F. Supp. 2d at 7 n.2 (collecting cases from other circuits).

*Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), leaving the Secretary well-equipped to make statutorily mandated DSH payments without relying on retroactive rulemaking authority.

One final observation dooms the Secretary's invocation of this retroactivity exception. If the court construes "necessary to comply with statutory requirements" to encompass cases like this one—when an earlier interpretation "violates" what is now understood to be "the 'clear meaning' of the statute," ECF No. 22, at 30—then every time the Secretary correctly reinterprets the Medicare statute, retroactivity will inevitably follow. As the court already has observed, *see supra* Section IV.B.1, that view of the statute would run headlong into the retroactivity scheme's plain text because Section 1395hh(e)(1)(A) envisions that "substantive change[s]" to "interpretive rules" and "statements of policy" may be made retroactive in a limited subset of cases, not automatically in every instance. For these reasons, the 2023 Rule cannot be sustained on the Secretary's authority to make retroactive changes when necessary to comply with the requirements of the Medicare statute.

b.    *The Secretary did not establish that his failure to apply the 2023 Rule retroactively would have been contrary to the public interest*

The parties also dispute whether the second statutory exception for retroactive rulemaking justifies the 2023 Rule. The Secretary may retroactively apply his new interpretation for Part C days retroactively if he determines that a failure to do so "would be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A)(ii).

Montefiore contends that this provision does not grant the Secretary "plenary discretion to decide what is in the public interest," ECF No. 24, at 32, and it instead incorporates the APA's "analogous good cause exception to advance notice-and-comment rulemaking," ECF No. 19-1,

at 28.  That exception is construed to apply only in "rare circumstance[s]," which Montefiore

insists are not met here.  ECF No. 19-1, at 28 (quoting *Mack Trucks, Inc. v. Env't Prot. Agency*,

682 F.3d 87, 95 (D.C. Cir. 2012)).  Additionally, Montefiore argues that it is not in the public

interest to "pull[] the rug out from under the feet of thousands of safety-net hospitals, depriving

them of billions of dollars illegally withheld for years."  *Id.* at 29.

The Secretary meanwhile disputes the comparison to the APA and asks the court to grant

his determination "considerable deference."  ECF No. 28, at 20.  In the 2023 Rule, the Secretary

reasoned that "there is currently no regulation in place that expressly addresses the treatment of

Part C days" and, absent retroactive application, "the Secretary would be unable to calculate and

confirm proper DSH payments for time periods before [Fiscal Year] 2014, which would be

contrary to the public interest of providing" funds to hospitals serving "a disproportionate number

of low-income patients."  2023 Rule, 88 Fed. Reg. at 37774-75.

As with the first retroactivity exception and for substantially similar reasons, the court

agrees in part with Montefiore, which is enough to grant summary judgment to the hospital.[12]  The

---

[12] Montefiore's argument that the public interest exception incorporates the body of law
interpreting APA Section 553's public interest "good cause exception" runs counter to the way the
Supreme Court viewed a related issue in *Allina II*.  There, the Secretary contended that when
Congress used the phrase "substantive legal standard" in Section 1395hh(a)(2), it was importing
APA Section 553(b)(A)'s understanding of the difference between policy statements and
interpretive rules.  *Allina II*, 587 U.S. at 573-76.  The Court rejected that argument and reasoned
that Congress knew how to cross-reference the APA in Section 1395hh because it expressly did
so by mentioning the APA's public interest "good cause" exception in the Medicare statute's
provision concerning notice requirements for proposed regulations.  *Id.* at 576-77; *see* 42 U.S.C.
§ 1395hh(b)(2)(C).  Similar logic applies here.  The public interest retroactivity provision in the
Medicare statute does not mention the APA.  *See* 42 U.S.C. § 1395hh(e)(1)(A)(ii).  From that
silence, the court infers that Congress did not intend to adopt the stringent "good cause" standard
from APA Section 553(b).  *Cf. Alabama*, 774 F. Supp. 3d at 157 ("The court generally does not
assume that Congress omitted requirements that it meant to impose, especially 'when Congress
has shown elsewhere in the same statute that it knows how to make such a requirement manifest.'"
(quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005))).

court is aware of no case interpreting the public interest exception in Section 1395hh(e)(1)(A)(ii) or evaluating the Secretary's invocation of retroactive rulemaking authority under that provision. Fortunately, it does not write on a blank slate because "'[p]ublic interest' criteria are, of course, found with regularity in the modern administrative state." *Dirks v. Sec. & Exch. Comm'n*, 802 F.2d 1468, 1471 (D.C. Cir. 1986).  The Supreme Court "ha[s] long held that 'the words "public interest" in a regulatory statute' . . . 'take meaning from the purposes of the regulatory legislation.'" *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 2507 (2025) (quoting *Nat'l Ass'n for Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976)).

Even when an agency head receives substantial discretion to decide what is in the public interest, a court's deference is not unbounded.  For example, the Federal Communications Act prohibits the transfer or assignment of a broadcasting license unless the Federal Communications Commission finds that it would be in the "public interest."  47 U.S.C. § 310(d).  That statute has been interpreted to "grant[] the Commission broad discretion" in assessing the "public interest." *NTCH, Inc. v. Fed. Commc'ns Comm'n*, 841 F.3d 497, 506 (D.C. Cir. 2016) (quoting *Fed. Commc'ns Comm'n v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981)).  At a minimum, courts review "the Commission's application of the Act's 'public interest' standard" under the familiar APA arbitrary-and-capricious test. *Id.*  So too with other agency heads in different contexts. *See, e.g.*, *Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n*, 77 F.4th 971, 980-82 (D.C. Cir. 2023). The court's role in APA review of a statute "delegat[ing] discretionary authority to an agency" is to "ensur[e] the agency has engaged in reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395 (internal quotation marks omitted).

It is unnecessary to determine the precise contours of the Secretary's discretion under the Medicare statute because his articulation of the public interest in the 2023 Rule does not survive basic APA requirements. The court's assessment must rise or fall on his "rationale at the time of the decision." *NTCH*, 841 F.3d at 506 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). The Secretary identifies only two ways that retroactivity advances the public interest: the need to make DSH payments and the need to faithfully administer the Medicare statute. Both justifications are arbitrary and capricious.

To begin, the Secretary limits his public interest determination to the scenario in which "there is a gap in the statute to fill." 2023 Rule, 88 Fed. Reg. at 37775. As the court addressed above, *see supra* Section IV.A, the statute unambiguously requires inclusion of Part C days in the Medicare fraction. The 2023 Rule offers no public interest justification for retroactive rulemaking absent a statutory gap. But even on its own terms, the need to make DSH payments rests on the same faulty logic the court has already rejected when addressing the first retroactivity limitation. *See supra* pp. 32-36. The notion that retroactivity is required to pay hospitals "that serve a significantly disproportionate number of low-income patients," 2023 Rule, 88 Fed. Reg. at 37775, is flatly contradicted by *Northeast Hospital*'s recitation of the pre-2004 policy, which the D.C. Circuit reaffirmed in *Allina I*, and the Secretary's publication in 2006 of fractions that excluded Part C days, *see supra* pp. 34-35.

The Secretary's second justification essentially mirrors his argument for why retroactivity is necessary to comply with statutory requirements. He concedes as much in the final rule when he reasons that "it is in the public interest for the Secretary to enact rulemaking that reflects what he believes is the best interpretation of the statute, . . . because to do otherwise may result in payments . . . in excess of what he believes is authorized in the DSH statute." 2023 Rule, 88 Fed.

Reg. at 37777.  Yet as a matter of statutory interpretation, the public interest exception cannot be read in such a way that makes the statutory compliance exception "altogether redundant." *Concert Inv., LLC v. Small Bus. Admin.*, 100 F.4th 215, 221-22 (D.C. Cir. 2024) (quoting *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018)).  The Secretary's insistence that the public interest is to administer the statute in accordance with a new interpretation turns a statutory limitation into a floodgate favoring retroactivity.

In any event, the Secretary's rationale suffers a fatal defect that renders it arbitrary and capricious.  While "[i]t is in the public interest that hospitals are paid in accordance with the statute" and not "in excess of what Congress intended," 2023 Rule, 88 Fed. Reg. at 37778, that reasoning does not grapple with the costs of imposing that requirement retroactively.  It fails to balance those interests against the harm that retroactivity works on "[e]lementary considerations of fairness." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  "[T]he concern animating the Supreme Court's retroactivity jurisprudence is that 'settled expectations should not be lightly disrupted.'" *Acree v. Republic of Iraq*, 370 F.3d 41, 65 (D.C. Cir. 2004) (Roberts, J., concurring) (quoting *Landgraf*, 511 U.S. at 265), *abrogated on other grounds by Republic of Iraq v. Beaty*, 556 U.S. 848 (2009).  The Secretary's "fail[ure] to consider an important aspect of the problem" renders the 2023 Rule defective.  *State Farm*, 463 U.S. at 43.

For these reasons, the 2023 Rule satisfies neither the "necessary to comply" exception nor the "public interest" exception for retroactive rulemaking.  The court will therefore grant Montefiore's motion for summary judgment and deny the Secretary's cross-motion for summary judgment.

### C.    The 2023 Rule is Arbitrary and Capricious

Aside from the 2023 Rule's retroactivity defect, Montefiore argues that the rule is arbitrary and capricious on several grounds.  It first claims that the agency failed to adequately explain the change in policy and gave insufficient notice about its reliance on *Empire Health* when justifying the regulation.  ECF No. 19-1, at 35-37; ECF No. 24, at 40.  Montefiore also contends that HHS did not adequately consider hospitals' reliance on the prior policy of excluding Part C days in the Medicare fraction.  ECF No. 19-1, at 37-39; ECF No. 24, at 36-39.  It then says that the Secretary's analysis failed to grapple with the financial impact of the regulation and comply with a statute requiring agencies to assess impacts on small businesses.  ECF No. 19-1, at 39-42; ECF No. 24, at 40-42.

Arbitrary and capricious review is "deferential, and a court may not substitute its own policy judgment for that of the agency."  *Inteliquent, Inc. v. Fed. Commc'ns Comm'n*, 35 F.4th 797, 802 (D.C. Cir. 2022) (quoting *Prometheus Radio Project*, 592 U.S. at 423).  It must only "ensure[] that the agency has acted within a zone of reasonableness" by "consider[ing] the relevant issues and reasonably explain[ing] the decision."  *Prometheus Radio Project*, 592 U.S. at 423. "[A]nd '[o]f course, it would be arbitrary and capricious for [an] agency's [decisionmaking] to be "internally inconsistent.""'  *World Shipping Council v. Fed. Mar. Comm'n*, No. 24-1088, 2025 WL 2698837, at *5 (D.C. Cir. Sep. 23, 2025) (second alteration in original) (quoting *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018)).  Even when the agency's decision is "of less than ideal clarity," the court will still uphold it if "the agency's path may reasonably be discerned."  *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Off. of Foreign Assets Control*, 857 F.3d 913, 928 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43).

Of Montefiore's arbitrary and capricious challenges, the court agrees that the 2023 Rule is unreasonable and unexplained with respect to its financial impact on regulated parties.[13]    First

---

[13] Montefiore has not established that the 2023 Rule inadequately explained a change in policy or noticed parties about *Empire Health*, ECF No. 19-1, at 35-37; ECF No. 24, at 40, or that it failed to consider reliance interests, ECF No. 19-1, at 37-39; ECF No. 24, at 36-39.    Contrary to Montefiore's understanding of the administrative record, the Secretary "acknowledge[d] [his] position change," ECF No. 19-1, at 36, by explaining in considerable detail his stance on the DSH fractions dating back to 2004 and the decades-long litigation against HHS's regulatory efforts, *see* 2023 Rule, 88 Fed. Reg. at 37773.    Montefiore's position misunderstands the Secretary's argument, both in the 2023 Rule and the summary judgment briefing.    In the 2023 Rule, the Secretary asserted that because the statutory meaning of Section 1395ww(d)(5)(F)(vi) is fixed with respect to treatment of Part C days, the 2023 Rule does not substantively change a *legal standard*. 2023 Rule, 88 Fed. Reg. at 37775.    He conceded—at least in the administrative record—that the retroactive application of his interpretation "effect[s] a 'substantive change' to the DSH regulations."    *Id.* at 37785.    Montefiore fares no better by arguing that the Secretary inadequately noticed parties about the *Empire Health* decision and what role it would play in the 2023 Rule's analysis.    Without naming the Ninth Circuit's *Empire Health* decision, the Secretary made a similar argument to that which eventually prevailed before the Supreme Court: that Section 1395ww(d)(5)(F)(vi) *requires* considering Part C enrollees as "entitled to [Part A] benefits."    2023 Proposed Rule, 85 Fed. Reg. at 47725.    Finally, Montefiore's arbitrary and capricious argument concerning reliance interests presents a closer question, but ultimately fails. While the 2023 Rule dismisses any reliance on HHS's past practice as "[un]reasonable" and fails to meaningfully engage with possible reliance interests, *see* 2023 Rule, 88 Fed. Reg. at 37788, Montefiore fails to unearth any reliance interests that hospitals alleged with specificity in the notice-and-comment period.    "[U]nidentified and unproven reliance interests are not a valid basis on which to undo agency action" and "[i]nstead . . . must be specifically identified, reasonably incurred, and causally tied to the [earlier policy]."    *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).    The best evidence for "specifically identified" reliance interests that Montefiore can marshal, *id.*, are several comments in the administrative record in which hospitals alleged that they had "relied on the agency making DSH payments in accordance with [prior policy]," ECF No. 19-1, at 38 (alteration in original) (quoting ECF No. 29-2, at 42) (for all cites to the Joint Appendix, ECF No. 29, the court refers to the ECF-generated page numbers at the top of each page, rather than any internal pagination).    The alteration in Montefiore's briefing does considerable work for its argument.    During the rulemaking process, the hospitals making the reliance interest argument contended that they had relied on the D.C. Circuit's and Supreme Court's decisions in *Northeast Hospital* and the various *Allina* cases, not the pre-2004 policy of excluding Medicare Part C days in the DSH fraction.    *See* ECF No. 29-2, at 42, 54, 60; ECF No. 29-3, at 35, 39, 51, 64.    What is more, the hospitals asserting reliance interests pointed to HHS's practice between 2013 and 2016 of "reopening notices" based on pending litigation.    *See, e.g.*, ECF No. 29-2, at 42; ECF No. 29-3, at 55.    Aside from the fact that these representations are

(*continued on next page*)

consider the Secretary's argument that financial impact is not an "important aspect of the problem," which can be resolved with ease. *See* ECF No. 22, at 37. In his view, financial impact need not be considered at all because the rule merely addresses the agency's statutory interpretation and not a policy choice. *Id.* However, the implication of the court's conclusion about the 2023 Rule's retroactive effect, *see supra* Section IV.B, is that *Loper Bright* cannot be read to confer a get-into-retroactivity-free card whenever the Secretary correctly reinterprets the Medicare statute. Instead, the statute's limited exceptions for retroactivity apply, and the Secretary's efforts to comply with the statute are reviewable under the APA. The Secretary therefore confuses the relevant inquiry when he reasons that "the financial impact of the interpretation of 'entitled to benefits under [P]art A' is not legally relevant to the substance of CMS's [statutory] interpretation." 2023 Rule, 88 Fed. Reg. at 37792. That may be true so far as the interpretive question is concerned, but it is a non sequitur in response to the wholly separate question of whether the failure to retroactively apply that interpretation is contrary to the public interest.

The Secretary's reliance on *Florida Health Sciences Center, Inc. v. Becerra*, No. 19-CV-3487, 2021 WL 2823104 (D.D.C. July 7, 2021), fares no better. *See* ECF No. 22, at 36-37; ECF No. 28, at 25. There, the district court rejected a challenge by hospitals claiming that the 2013 Rule—which prospectively applied an interpretation of the DSH fractions that included Part C days in the Medicare fraction, 2013 Rule, 78 Fed. Reg. at 50496, 50614-20—was

---

generic, meaning that they fail to identify what specifically the hospitals *did* to rely on a policy or judicial decision, they are largely irrelevant because any alleged reliance is not causally tied to the 2023 Rule, which only affects "discharges occurring *prior* to October 1, 2013." 2023 Rule, 88 Fed. Reg. at 37772 (emphasis added). It would not surprise the court if, before that date, hospitals *had* relied on the expectation that Part C days would be excluded from the Medicare fraction. But none of the hospitals submitting public comments to HHS's proposed rule nor Montefiore in its briefing here has alleged anything specific—like budgeting decisions or hospital admittance policies—that was affected by their expectation of the Secretary's interpretation.

arbitrary and capricious for its failure to consider financial impact. *Fla. Health Scis. Ctr., Inc.*, 2021 WL 2823104, at *4-16. In doing so, the court determined that "the potential financial implications of the 2013 Rule were not relevant to the agency's statutory analysis." *Id.* at *13. The Secretary's claim here that the "*Florida Health* [c]ourt's reasoning [on this point] is squarely applicable," ECF No. 22, at 37, defies logic. *Florida Health* concerned a challenge to a rule that had only prospective application, which justified that court's conclusion that policy considerations are irrelevant to statutory interpretation. Here, the Secretary seeks judicial approval for a plainly retroactive rule that may only be sustained if it complies with Section 1395hh(e)(1)(A)'s retroactivity exceptions—both of which implicate the Secretary's policymaking authority and, to comply with the APA, require his retroactivity determination to be reasonable and reasonably explained.

Nor does the record support the Secretary's assertion that his consideration of the financial impact measures up to the APA's demand for reasoned decisionmaking. ECF No. 22, at 36 (pointing to 2023 Rule, 88 Fed. Reg. at 37780, 37791-92). In the 2023 Rule, the Secretary assessed that the regulation's financial impact would run between $0 and $0.6 billion annually. 2023 Rule, 88 Fed. Reg. at 37791-93. At the top end of the Secretary's calculation, the impact for the nine-year period from 2005 to 2013 could be as much as $5.4 billion. But the bottom end projects potentially *no* financial impact. That calculation pales in comparison to the "multibillion dollar difference" that the "[s]everal commenters estimated." *Id.* at 37791. It also cannot be squared with the agency's representations before the Supreme Court in *Allina II*, namely that including Part C days in the Medicare fraction from 2005 to 2013 would "reduce[e] hospitals'

payments . . . by between $3 and $4 billion over a 9-year period." ECF No. 19-1, at 15 (quoting *Allina II*, 587 U.S. at 571).[14]

The Secretary makes two attempts to reconcile his projections with the Supreme Court's understanding of the financial impact. First, he claims that the projection provided to the Supreme Court "neither stated nor implied that an adverse . . . decision that did not touch on the merits of his interpretation would lead him to pay providers according to their preferred interpretation." 2023 Rule, 88 Fed. Reg. at 37788. Fair enough. But that is non-responsive to the concerns raised by the hospitals. Moreover, the incompatibility between his projections is not rectified by his assertion that the $3 to $4 billion impact over nine years is consistent with a $0.6 billion impact annually. ECF No. 22, at 36 n. 15. The issue stems from the bottom—not the top—end of his current estimates. How can the Secretary's interpretation simultaneously have no impact, while, at the same time and over the same time horizon, decreasing payouts by up to $4 billion? Put differently, the Secretary's financial analysis is not deficient because the government's characterization of the impact in *Allina II* fits within the top end of his current projections. Rather, it fails to withstand arbitrary-and-capricious review because he insists that the 2023 Rule might cost *nothing* when elsewhere the government has claimed the tab might run to $4 billion.

Second, perhaps sensing the irrationality, the Secretary acknowledges the commenters' concerns but in a manner that fatally undermines the possibility that his 2023 Rule could have no financial impact at the low end of any projection. That is because the Secretary admits that he

---

[14] Recall that *Allina II* resolved a challenge to the Secretary's 2014 policy that interpreted the DSH fraction to include Part C days in the Medicare fraction and pledged to apply it retroactively. 587 U.S. at 571-72. The government's representations to the Supreme Court in *Allina II* concerning the financial impact of the Secretary's 2014 announcement on the "9-year period" preceding the policy, *id.* at 571, are directly comparable to the 2005 to 2013 timeframe at issue here.

"has acknowledged[] that the financial impact of [his] interpretation . . . to include Part C days in the Medicare fraction as compared with excluding them[] is *significant*."  *Id.* at 37792 (emphasis added); *see id.* at 37790 (conceding that "the effect of Medicare DSH payments on some hospitals is significant"), 37792 (admitting that the proposed rule said the same).  Insofar as this qualifies as "consider[ing] financial impact," ECF No. 28, at 25, the Secretary's paltry, contradictory, and otherwise non-responsive answers to "relevant and significant concerns about the costs associated" with the 2023 Rule fail to meet the APA's requirement for "reasoned decisionmaking," *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 477 (D.C. Cir. 2022); *cf. World Shipping Council*, 2025 WL 2698837, at *5-6 (explaining that an internally inconsistent rule was arbitrary and capricious).

Commenters also raised specific concerns with the agency's modeling and analysis, including that (1) the "CMS's calculations . . . using the illustrative model . . . [were] 'suspect' due to issues with the [agency's] data file, such as the exclusion of Medicaid patients"; (2) the "proposed rule's description of the summary benefits of costs and benefits . . . as 'highly uncertain'" was unsound because the model was estimating historical payments, for which the Secretary had data, rather than prospective conduct; (3) the "model did not include hospitals that [did] not currently qualify for DSH payments, but would . . . under the [hospitals'] alternative approach"; (4) the model "understat[ed] the effect of the [Secretary's interpretation] on the Medicaid fraction" by "exclud[ing] the very large number of Medicaid patients who are not receiving SSI benefits"; and (5) the model "unreasonabl[y] . . . use[d] only 2013 data" when estimating the financial impact for 2004 to 2013.  2023 Rule, 88 Fed. Reg. at 37791.

In the final rule, the Secretary offered more contradictory and non-responsive answers to these considerations about the financial projections.  First, he claimed that "DSH payments under

the [2023 Rule] will not differ from historical payments for years after . . . 2005 for most hospitals because CMS has made payments" that assume Part C days are included.  *Id.*  The Secretary struck a similar note in the proposed rule.  There, he maintained that under the "proposed policy"—the same one HHS adopted in the final rule—"DSH payments . . . would not differ from hospitals' historical DSH payments."  2023 Proposed Rule, 85 Fed. Reg. at 47726.  In other words, post-2005 payments already included Part C days.  But that simply restates the premise underlying the commenting hospitals' concerns: the failure to pay them under a policy of excluding Part C days from the Medicare fraction is *why* the 2023 Rule has a multibillion-dollar impact.  *Cf. World Shipping Council*, 2025 WL 2698837, at *6 ("[R]estating the *terms* of the Rule does not explain . . . the *logic* of the Rule . . . .").  And, insisting that "hospitals had years of experience of the financial impact of the Secretary's interpretation," 2023 Rule, 88 Fed. Reg. at 37792, is inadequate when offered to rebut the financial impact of the *alternative* interpretation.[15]  In doing so, the Secretary makes a point about reliance interests in response to significant concerns about financial impact.

Equally unconvincing are the Secretary's efforts to bolster the financial model used to project the final rule's impact.  He insists the "estimates" are compiled only for "illustrative purposes" and stresses that HHS relied on "modelling assumptions . . . which may differ from actual calculations."  *Id.*; *see id.* at 37791 (same).  The Secretary offers no other substantive response to commenters' concerns with the financial model.  For APA purposes, he cannot rely on

---

[15] As a factual matter, the administrative record belies the Secretary's argument that hospitals have been aware for years of the policy of including Part C days.  The evidence that Montefiore has marshaled and the administrative record itself indicate that from 2005 to 2007, HHS published fractions excluding Part C days.  ECF No. 19-1, at 7; *see* 2023 Rule, 88 Fed. Reg. at 37792 n.17 (conceding that the CMS regulations were not amended until 2007).

the model to claim that he considered the 2023 Rule's financial impact, but then avoid his obligation to respond to seemingly legitimate questions about the model's inputs and refuse to bridge the gap between its output and the figures the government has relied on in the *Allina II* litigation. *Cf. Williston Basin Interstate Pipeline Co. v. Fed. Energy Regul. Comm'n*, 519 F.3d 497, 503 (D.C. Cir. 2008) (holding that an agency's order was arbitrary and capricious in part for its failure to "reconcile" discrepancies between numbers put before the agency). Once again, "the [Secretary's] failure to respond to relevant and significant comments about the direct and indirect costs of [the 2023 Rule] [is] sufficient to render [his] decision arbitrary and capricious." *Bloomberg*, 45 F.4th at 477.

Finally, the Secretary's discussion of financial impact is not saved by his speculation that some hospitals could be worse off under Montefiore's interpretation than under the 2023 Rule. The Secretary discussed financial impact in response to some hospitals' comments that disputed the proposed rule's statutory interpretation. 2023 Rule, 88 Fed. Reg. at 37780. In these comments, some hospitals argued, as the plaintiff in *Empire Health* did before the Supreme Court, that the phrase "for such days" in the DSH statute compelled the agency to exclude Part C days from the Medicare fraction because HHS was not paying directly for those services. *Id.*; *see Empire Health*, 597 U.S. at 439-40. The Court rejected that claim, and in doing so, noted that the hospital's interpretation might result in excluding from the Medicare fraction *and* the Medicaid fraction low-income Part A beneficiaries who had exhausted their benefits. *Empire Health*, 597 U.S. at 443-44. In the 2023 Rule, the Secretary repurposes that argument, suggesting that to consider Part C beneficiaries as not "entitled to [Part A] benefits" would exclude such individuals from both fractions and "put some hospitals in a *worse* position than the Secretary's view." 2023 Rule, 88 Fed. Reg. at 37780.

Conceptually, the Secretary's bottom line—that "some" hospitals "may" be worse off by excluding Part C days from both fractions—contradicts how the statute is expected to operate. As recognized in *Northeast Hospital*, Part C enrollees "tend to be wealthier than individuals who receive care under Part A." 657 F.3d at 3. That intuition suggests that hospitals may not be worse off by excluding Part C days from the Medicare fraction. And, the Secretary cannot claim that hospitals may be worse off under their interpretation without showing his work. He offers no data or analysis other than the potentially inapt comparison to *Empire Health*. This throwaway line speculating about financial impact is woefully insufficient when the government has represented to the Supreme Court that the consequences could run as much as $3 or $4 billion dollars. *See Allina II*, 587 U.S. at 571.

All told, the Secretary has failed to consider the commenters' arguments about the financial impact of his retroactive regulation. He has failed to explain the assumptions that underlie his scant analysis. And he has failed to offer any explanation—let alone a reasonable one—for why the agency has painted divergent pictures of the financial impact of the same interpretation across two lawsuits. These failures are particularly troubling given that the Secretary asks the court to defer to his decision on what is in the public interest. Under the APA, the Secretary's decision to invoke retroactive rulemaking authority must be reasonable and reasonably explained. Because the Secretary did not comply with that requirement, the final rule is unlawful.

### D. Remedy

The court must consider what remedy is appropriate. "'While unsupported agency action normally warrants vacatur, [a] court is not without discretion' to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (alteration in original) (quoting *Advocs. for*

*Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)).  The D.C. Circuit follows a two-factor test "governing that exercise of discretion: 'The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'"  *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

In its complaint, Montefiore asks the court to declare unlawful and set aside the 2023 Rule. ECF No. 1 ¶ 101.  It also asks the court to direct the Secretary to recalculate the fractions based on the pre-2004 policy of excluding Part C days and pay any additional reimbursement money due with interest.  *Id.*  Yet, in its request for vacatur, Montefiore fails to address the *Allied-Signal* factors or otherwise discuss why setting aside the 2023 Rule is more appropriate than simply remanding the case to HHS.  *See generally* ECF Nos. 19-1, 24. The Secretary, for his part, does not squarely address remedies.  He asserts that "any alleged flaws in the rulemaking process would be harmless error," ECF No. 22, at 32, but makes that argument primarily in response to Montefiore's assertion that the 2023 Rule required additional notice and opportunity for public comment, *id.* at 33; ECF No. 28, at 22.  The Secretary does not make any argument for why—in the event Montefiore is awarded summary judgment—the court would abuse its discretion by vacating the 2023 Rule.  *See Standing Rock Sioux Tribe*, 985 F.3d at 1051 ("We review the district court's decision to vacate . . . for abuse of discretion." (alteration in original) (quoting *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006))).

Notwithstanding the parties' failure to address the question of vacatur, the court may "raise the issue *sua sponte*" to comply with its "'duty' to ensure the propriety of [any] APA remedy." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (quoting

5 U.S.C. § 702)).  The court declines to decide the remedial issue without briefing from the parties.  *See Matson Navigation Co. v. U.S. Dep't of Transp.*, 471 F. Supp. 3d 60, 62 (D.D.C. 2020) (explaining in an opinion on APA remedy that the court had previously "left . . . unresolved . . . whether the remand should be with or without vacatur" and ordered supplemental briefing); *Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 377-78 (D.D.C. 2018) (resolving cross-motions for summary judgment but ordering the parties to appear at a status conference to address remedies "[r]ather than decid[ing] the issue without input from the parties"); *see also Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-CV-1871, 2024 WL 1241906, at *1 (D.D.C. Mar. 22, 2024) (noting that the parties had asked the court to first decide summary judgment motions and then order supplemental briefing on the proper remedy).

While the parties have not contested whether the *Allied-Signal* factors favor vacatur, the court anticipates they will dispute both.  Accordingly, the court will require the parties to file a joint status report with a proposed briefing schedule.  In their supplemental briefs, the parties must address whether, under *Allied-Signal* and its progeny—and considering the court's merits disposition of the parties' summary judgment motions—vacatur of the 2023 Rule is the appropriate remedy.

## V.    CONCLUSION

For the foregoing reasons, the court will grant Plaintiff's Motion for Summary Judgment, ECF No. 19, and deny Defendant's Cross-Motion for Summary Judgment, ECF No. 21.    A contemporaneous order will issue.


_____
LOREN L. ALIKHAN
United States District Judge

Date:    September 30, 2025